Move to the second case this morning, U.S. Futures Exchange v. the Chicago Board of Trade. Good morning, Your Honors, and may it please the Court, I'm David Solomons on behalf of the appellants. The Chicago Board of Trade has long held a monopoly in U.S. Treasury futures contracts. Around 2004, there was a unique opportunity for appellants to enter the U.S. market and compete directly with the Board of Trade with a new electronics futures exchange. Appellants were well-positioned to do so because U.S. traders were already familiar with their exchange platform, but timing was critically important. The Board was itself transitioning to a new electronic exchange. The first few weeks of a new exchange are always the most critical for its success and failure, and there were a large number of Treasury futures that were set to expire around that time that provided a short window for traders to transfer their open contracts to our new exchange and provide immediate liquidity. Were those in someone else's portfolio? Were they reserved somewhere or were they free-floating? They were futures contracts that were held at the time by BOTC, the clearinghouse that was used by the Board of Trade and that is now our clearinghouse, and part of the dispute in this case is that the Board of Trade pushed through a rule that forced those open contracts that they did not own and had no contractual or other right to control to be transferred to their new exclusive clearinghouse, CME, that they contracted with solely to preclude us from being able to enter the market and have access to those open contracts, and that's one of the claims. That was how many years ago? This is back in 2004, Your Honor. The proceedings of the District Court, shall we say, have not proceeded quickly, but we are here now, and the District Court, for our purposes today, made two fundamental legal errors that protected the Board of Trade's anti-competitive conduct. The first had to do with the Norr-Pennington Doctrine, and the second had to do with implied antitrust immunity, and each of which is a fundamental legal error that requires reversal. Let me start with Norr-Pennington. The District Court erred as a matter of law in holding that the CFTC's proceedings by which it reviewed and approved appellant's application to become a designated contract market was legislative in nature rather than adjudicative. That error caused the court below to improperly immunize defendant's fraudulent statements to the CFTC and to impose an impossibly high standard for showing a sham abuse of process, and so this error, this failure to recognize that the proceedings were adjudicative rather than legislative, requires reversal on all Norr-Pennington issues in this case. The CFTC's review of the application has all the hallmarks of an adjudicatory proceeding for First Amendment purposes. Are those hallmarks something that's going to obviously require a judge as opposed to people negotiating among themselves? Absolutely, Your Honor. In fact, I don't think there's any dispute about this. Even the defendants concede that if the CFTC had denied our application, we would have then immediately had the right to go to an ALJ and then to this court for judicial review over that decision, and the standards would be the same, which are the statutory factors. Had we complied with the statutory factors for becoming a designated contract market, it's not a legislative consideration. As this court in Mercatus described the difference, one of the primary features of a legislative process is when the agency is acting on matters of discretionary authority. And in contrast, the court said, is where the agency is instead guided by more definite standards susceptible to judicial review, and that is exactly what we have here. And the agency itself made this abundantly clear. In fact, I would refer the court to page—it's the supplemental appendix at 175, which is the commission staff's memo recommending approval of appellant's application to become a designated contract market. And one of the meritless objections that defendants raised was that, wait, you can't do this. You have to do a full-blown cost-benefit analysis before you can approve our application. And the staff in responding to that, I think, makes it absolutely clear this is for First Amendment purposes in adjudication. What the staff said is that Section 15A of the Act, which was adopted as part of the CFMA, provides that the commission shall consider the costs and benefits of its actions before promulgating a rule or issuing an order, but that there were statutory exceptions for that cost-benefit analysis. And the two that the staff focused on were for an adjudicatory process or for commission actions that, quote, are a finding of fact regarding compliance with the requirement of the commission. And then the CFTC goes on to say that the requirement for a cost-benefit analysis is not required here because, unlike general regulations in certain orders, the commission has little discretion when it considers and disposes of an application for a contract market designation. And then it walks through Section 6 of the Act and the statutory factors that control that decision. And then it says, thus, if the commission finds that the applicant meets the requirements of the Act, it is required to grant designation. Section 6 does not permit the commission to deny an application due to the actual or perceived cost of approving the application. And in the same way, it doesn't permit any consideration of broader policy or other types of factors that you would normally see in a legislative process. And again, it's not disputed that if they had denied our application, we would have had a right to an ALJ review and then to judicial review of that statutory determination. And it makes no sense to try to draw some distinction. The agency is exercising the same authority, whether it grants or denies the application, and that authority is inherently adjudicative. And I would urge the Court, if it has any doubts or questions about this, to look at the actual order of designation. It's cited on page 5 of our reply brief that approves our application. And it reads very much like a judicial opinion. It says that it's based on the following findings and rulings. And then it says in all caps, it is ordered that under this statute, the application for USFE for designation as a contract market is approved. It is further ordered that they have to maintain their status. And then all the trappings of a judicial opinion are there. And if you contrast that with what this Court considered in Mercatus, which is the most — the leading case from this Court on this line between adjudicative and legislative, there the Court was dealing with a city zoning determination. And it was a resolution. And the Court concluded that it was legislative in nature. But if you look at that order, which I have here, it speaks in terms of the resolution being passed, and then it counts the ayes and the nays of the vote, which is very much a legislative order. And so the distinction between these two, I think, is not difficult. And in this context, I don't think there's any good argument. And despite the Court below having made this mistake, I think it is clear that this is adjudicative in nature. And the very issues — you don't have to hypothesize whether they're capable of administration by a court. They are subject to judicial review. And so we know that they are administrable by a court. Mr. Simmons, is the order in Mercatus that you reference part of our record? It is. And could you give me a cite to it? Well, I will get that for you, Your Honor. Because of the way the record was pulled together for the joint appendix, we thought it was easier to give the Court the direct link to the website, which is what's on page 5 of our reply brief. Thank you. But it is part of the record in this case, and it is the action that approved us as a designated contract market. Well, you refer to a legislative process as being, I guess, a sort of a freewheeling negotiation with one another, doing this, that, and the other thing. But legislators do, as you mentioned, zoning, which is obviously a counsel process, designing the zoning. And it becomes an adjudicated situation when some external, I don't know, you can talk to an ALJ or whatever, somebody independent of the people who would be involved in the legislative process has to make a decision. Does your company still exist? It does, yes, Your Honor. Okay. Because it's been a long time. That's just wonderful you survived through all that. Well, we do not operate an exchange in the United States, but the company still exists. Oh. But I don't know if you've heard of that, but I guess that's the current status. As a result of these efforts, the exchange was unable to attract sufficient support, and it no longer operates. To operate in the United States. Correct, in the United States. That's right. Yes, Your Honor. I would also just remind the Court, when thinking about this question, is this subject to review under the exceptions to Noor Pendington, or is it too much like a legislative process that the Court should keep in mind that the Supreme Court of the United States in Omni Outdoor Advertising was very clear about the kinds of things that constitute a sham. And it said the sham exception to Noor encompasses situations in which persons use the governmental process as opposed to the outcome of that process as an anti-competitive weapon. And that's exactly what we have here. There was never any doubt that our application would be approved because we more than complied with the statutory requirements. It was all about using the process to delay. And then the Supreme Court said, the classic example is the filing of frivolous objections to the license application of a competitor with no expectation of achieving denial of the license, but simply in order to impose expense and delay. That's the classic example of what is sham petitioning. And that is exactly this case. And the other courts of appeals that have looked at similar agency proceedings for approval of a license applications, this is the Ninth Circuit in Cottle and the Eleventh Circuit in St. Joseph, have likewise said that those are adjudicative in nature and the exceptions to the Noor-Pennington Doctrine apply and sham petitioning analysis is required and liability is appropriate. Whereas we have here, you have a defendant that is engaged in petitioning that is not tied to the ultimate outcome of the petitioning process, but to abusing the process itself and making fraudulent and false representations during that process. If it pleases the court, I'll shift now to discuss the issue of implied antitrust immunity, which is the second major error that was committed below. In that, the issue here has to do with the transfer of those open contracts, that open interest that we were discussing at the beginning. The forced transfer and the adoption of exclusive clearing services through a rule that the Board of Trade adopted and then submitted through a rushed process for CFTC approval. The court below incorrectly held that the CFTC's approval implied an immunity for defendants' anti-competitive actions and the court committed several errors in that holding. Most significantly, the court ignored this court's requirement in American Agriculture that was a case about implied antitrust immunity involving the Commodities Exchange Act, the very act we have at issue here, where this court required, among other things, that the court had to undertake a careful analysis of the nature and scope of the deliberative process employed by the agency in determining whether it would allow an implied repeal of the antitrust laws for that activity. Because this court recognized that that's an extraordinary thing to do. It's the exception. It's not the rule. Normally, even actions that are covered by an agency's regulatory authority still give rise to antitrust liability if they, in fact, are anti-competitive. And it's the exception and not the rule, and it can only be applied where it's absolutely required to avoid a repugnancy, the Supreme Court has said, to imply a repeal of the antitrust laws for certain conduct. So that's what this court looked at in American Agriculture and, excuse me, yeah, American Agriculture, and what it said was that the scrutiny and approval of the challenge practice needs to be active, intrusive, and appropriately deliberative. And we don't have that here. We have a process through which, because of misstatements and misrepresentations made by defendants, the CFTC rushed through an approval process with only three and a half days of public comment, which had never occurred before. The agency, their expert themselves, in the summary judgment record, acknowledged that there had never been such a short public comment period before, and there simply wasn't sufficient deliberation of the antitrust issues to imply immunity. And apart from the amount of deliberation, the agency itself has acknowledged that it does, the standard it's required to apply in approving these voluntary rules, and again, remember, this isn't the agency deciding we need to regulate in a broad way. This is the agency looking at a voluntary rule that's been adopted by an exchange which they could have simply self-certified, and then deciding whether there's any reason to stop them from adopting it, and the only reason they're allowed to is if it actually violates the Commodities Exchange Act. The CFTC itself in 2009, and this is at A140 of the record, and the documents that are attached there, says that the CFTC itself said that the standard of review that it has to apply for rule filings, which is what we have here, which forbids the agency from disapproving a rule unless it finds that it would violate the CEA, does not afford the agency sufficient authority to ensure exchange and clearinghouse compliance with the CEA, adopt market conditions and international standards, and protect the public. So this is very different than the kind of authority the SEC had in the Credit Suisse case. Here, the CFTC doesn't have that kind of sweeping regulatory authority. It waits until an exchange voluntarily adopts a rule, and then it has a very limited role in deciding whether to approve it, and in almost every instance it approves it, and even if it doesn't, the board could simply self-certify. And if you look at what actually happened in this case, defendants' submission for these forced transfer and exclusive dealing rules, their submission to the agency twice in their submission said that the agency did not need to interpret any section of the Act or the Commission's regulations in order to approve or allow into effect the proposed amendments. That's at A141. And so it wasn't asking the agency to do any critical analysis of the statute or its regulations to adopt some broad policy. In fact, it said you didn't need to do that. And the rule itself, the approval itself, warned them against relying too heavily on the approval and said, as to the possibility of a dilemma where the exchange is considered obligated under this rule to enforce a policy found to be invalid, any policy issued under this rule found to be invalid by the Commission or otherwise, which means by a court, may be withdrawn. That's at Supplemental Appendix 14 and 15. So this is not a situation where the agency has carefully reviewed and analyzed all the antitrust issues that could give rise to implied repeal. I'd like to reserve the remaining of my time for rebuttal. You may do so. Thank you. Thank you. Mr. Hogan. May it please the Court. My name is Al Hogan. I'm privileged to represent the defendants in this case, the Chicago Board of Trade and the Chicago Mercantile Exchange. The antitrust laws are not meant to punish businesses for responding to the government's request for speech, nor do they provide redress for alleged harms occasioned by the purely discretionary scheduling decisions made by the government concerning its own deliberative process. They're also not meant to provide an avenue to collaterally attack an agency's explicit approval of a rule, and in doing so would create a direct conflict between the antitrust laws and that agency's statutory authority. And finally, the antitrust laws do not require a business to lend a helping hand to a rival that seeks to compete against it, let alone one that seeks to grab an entire market from it by free-riding. Does all that process that you're describing, is that what they're referring to as stalling? I'm sorry, Your Honor? Stalling. In terms of stalling? Yeah. I get the impression that all these things, if that's even an issue, of stalling the whole process, that's delay. You're talking about a process that you have to engage in in a lot of different areas. Well, Your Honor, the— I'm just asking you if that is the threshold, because I think they're talking about stalling this situation.  I understand that the plaintiff's case here is that the process was stalled. I guess the first thing I would point out is that the CFTC was in complete control of its process. What you had here was a 180-day process. Under the Commodity Exchange Act, from the time USFE's application was filed, the CFTC was required to act on it within 180 days. The CFTC did act on it within 180 days, and the CFTC was in complete control and its absolute discretion about the determination, for instance, to remove the application from Fast Track, which they did, and they explained why they did it, which is because the application was too large and complex. And they had complete discretion to ask for more speech, is what they did. Stepping back, Judge, the idea, again, that delay is occasioned by virtue of the lobbying process, the Norr-Pennington Doctrine recognizes explicitly in cases like City of Columbia, in professional real estate, where the Supreme Court spoke to that doctrine, is that delay, even if it's a direct harm to the competitor, doesn't make that conduct actionable. And even if the petitioner's sole purpose is to inflict delay, that is not actionable under the antitrust law, so long as the lobbying is being conducted in genuine ways. Now, the phrase genuine has been interpreted by the Supreme Court in PREI to have a subjective objective component. And so, I hear the plaintiff's story that they want to talk about how the process was delayed here. We reject that, but the threshold question is, what was the nature of the lobbying? Was it legislative? Was it political? In this case, it was. And so, that lobbying is entitled to nearly, if not absolute protection, even if the purpose was to delay. Does that answer the question? Well, it helps. I'm sorry, Judge? When you combine those two things together, you're doing something within the law that delays. That's basically what you're saying. There is no question that petitioning that is in front of a legislative body, or even for that matter, under the PREI test, in front of a litigation, if that litigation is objectively reasonable, then that ends the inquiry. It does not matter. If you think about the risks to the First Amendment principles protected by Noor Pennington, and this isn't me making this up. This is what the Supreme Court said in professional real estate. Jumping ahead and looking to subjective intent would basically vitiate Noor, particularly in the legislative process. I want to come back and talk about the legislative process, because counsels stake much of their case on the idea that this was adjudicative and not legislative. We need to step back and look first, what was the defendant's conduct here? What was the nature of this lobbying? What are the defendants accused of doing? They're accused of doing the following. Talking to members of Congress to exert political influence on the CFTC. Ex parte, lobbying, classic. Talking to the CFTC in an ex parte fashion. We did it. The exchanges did it. The plaintiffs did it. What else are they accused of doing? They're accused of responding to the government's request for public comment. Now, you've got to stop and think about that. Much of their case says that we put in baseless comment letters, and that that should be viewed as an adjudicative process. I would submit that if responding to a public comment letter turns into an adjudicative process that is subject to treble damage antitrust review, then there's significant damage done to the administrative state and to the First Amendment. The administrative state in all of its rulemaking capacities virtually all relies on the notice and comment process. That is the process that the CFTC used here to follow up and work on the plaintiff's DCM application. The last thing that we're accused of doing is making a request to the CFTC that was purely in their discretion for a scheduling adjustment of a few days to allow the CFTC to gather more public speech, which is what it wanted to do. Now, you can step back and say, we can look at the Mercatus factors, and plaintiffs relied heavily on the fact that they were subject to judicial review. That is an entire red herring. The Mercatus proceeding was entitled to administrative review. Notice and comment rulemaking that permeates the administrative state, which is admittedly legislative, is entitled to judicial review. The fact that there is a judicial review process at the end, down the road, does not convert the entirety of that process into an adjudication. And I think what Mercatus teaches is that you have to look, again, at the character of what the government was doing and how it was interacting. In this case, the First Amendment principles have to protect what these exchanges were doing. That interaction between the government and the governed is critical. And it's impossible to look at what the exchanges did here and say that they were participating in adjudication. If you look at the Mercatus factors, what's going on here? The most important thing is the ex parte discussions. I don't think I heard it. I didn't read it in their briefs. The words ex parte were never mentioned. It is an overriding major point of distinction between what happens in an adjudication and in a legislative setting. Your Honor was referencing that before. This DCM application was being considered by the CFTC in a highly political setting. They were talking to these plaintiffs ex parte. They were talking to the exchanges ex parte. They were also subject to political influences of Congress. While the CFTC was considering this application, there was a hearing in front of Congress. And the CFTC commissioner went and testified and answered questions from congressmen about this application. And frankly, put up with a little jawboning from Congress about this application. The CFTC's process was decidedly political. That is the kind of influence that would be shocking in an adjudication. But it was completely legitimate here. Because what the CFTC was doing was gathering opinions, gathering public comment, inviting the public, my client and others, to provide public information. And they did that within the structures of their 180 day time frame in which they completely controlled the process. And all of that you're calling is a legislative process. This is clearly a legislative process, Your Honor. It's clearly legislative. And if you look at all the hallmarks of it, between the ex parte proceedings, the congressional influence, frankly, the fact that there was never an evidentiary hearing on the record, that didn't occur. There was the CFTC having ex parte discussions and receiving public comment. There was no evidentiary record created. My friend points to the final order of designation. That was completely voluntary. And it was simply a way for the commission to document what it thought about the public's comments. And in terms of objectively baseless, the fact that they bothered to stop and address CME's and CBOT's comments goes to the fact that those comments were helpful to the process. And if you look at the designation memo and what the commissioner said when they approved this application, there's no question that they highly valued the wide open public nature of the comments and that they believed it helped further their process. Help us with this word voluntary, though. If you take a look at that, it does say it is ordered, it is ordered, it is ordered. Sure. How do we juxtapose those two things? I think it's the language that the CFTC chose to use. They submitted an order of designation. The one thing I would say is that I'm not entirely sure what judicial review would be from that order. But I do know if the CFTC were to have initially suggested they were going to deny the application, that's when the process drops into, as Your Honor mentioned, that drops then into an ALJ process where now a formal evidentiary record is created, fact finding occurs, evidence is taken under oath. None of that happened here. This was the CFTC gathering information and then writing a memo and, yes, it was called an order of designation, but that doesn't transform the process that they engaged in here into an adjudication. I think the last point on this idea of adjudication versus legislative is counsel made an argument that they didn't make in their papers, but that's with respect to some of the CFTC's comments about the process with respect to particularly their discretion. They cite to supplemental appendix, page 175. To the extent the court considered that, you should look carefully at what the CFTC said about what was going on there. That was in response to a comment that the CFTC in essence had to consider cost and benefits. The CFTC was explaining why it did not have to do a cost-benefit analysis in considering USFE's application, and they cited two of the three statutory exceptions. The one they didn't cite is an emergency action. It's clear it wasn't an emergency. The other two statutory exceptions are an adjudication or findings of fact that somebody was complying with the Commodity Exchange Act, and although they talked about their discretion, and I'll get back to that point in a second, the exception that they pointed to was not an adjudication. They said that what they were doing here was determining whether under what had been presented to them in this wide-open process, the DCM application complied with the Commodity Exchange Act. So if you read those pages, essay 175, 176, 177, you will see that they had the opportunity to call it an adjudication, and they did not. So I don't think the CFTC would ever believe that this process, which never invoked the adjudicatory procedures, was anything other than a wide-open political process. Last point on this idea of discretion, look, I understand that the DCM application here is subject to 26 factors and the core principles. Counsel says that that means it's just a straight-up test where the CFTC is checking the box, and then that's subject to judicial review. And what the CFTC is talking about here, again, on page essay 175, is that I tend to agree that once the CFTC has determined that all of the designation criteria are satisfied, the statutory mandate basically suggests that that application should be approved. But again, what you have to do is back up and say, look at what those factors are that they are considering. They are incredibly broad, they're wide-open, and they give the CFTC tremendous discretion in terms of how it's assessing this application. Another important point is that they don't just have to approve or deny. They can probe the applicant to make more disclosure, which they did here. They can probe the applicant to condition its application. And they did that here based on the comments that the CME and CBOT raised. So the question of discretion here, I think you have to look again at what was the CFTC doing when it was having those ex-party discussions, when it was reaching out to the public with a request for comment. They were gathering all this information to see what the landscape of this application looked like, and they have a lot of discretion in how they applied that. And they invoked that discretion to force USFE to change their application in response to the comments that CME and CBOT made. So this is clearly a legislative, political circumstance which is entitled to nearly, again, I say nearly, if not absolute protection under North Pennington. As we pointed out, no court in the 60 years since the North Pennington Doctrine was introduced, no United States court has ever found conduct in a legislative setting to be a sham. In this case, most certainly should not be the first. And last point on that. This process wasn't hijacked. This process wasn't abused. The CFTC wasn't shut off. They weren't cut off from access to the CFTC. The process worked here exactly as it should. And CME and CBOT's participation in that process was exactly what it should be. Free speech, protected by the First Amendment, and protected by North Pennington. Turning to the open interest question, one thing I want to clear up, a question that the bench asked of my colleagues, what is the open interest? What is it? It's important to understand that because the open interests are open contract positions, open positions that result from transactions that are executed on the Chicago Board of Trade futures contract. Chicago Board of Trade invented treasury futures contracts in the 70s. Transactions are executed on that exchange. Then they are sent to a clearinghouse. Then those contracts, to the extent they remain open, not offset by other transactions, are at the clearinghouse. But they are inextricably linked to the exchange. The exchange, under Core Principle 11, has an obligation to provide for the financial a clearinghouse. That is the exchange-directed clearing model that is approved. It was approved by the CFTC in this case, by the approval of the open interest rule. And it's been also reaffirmed by Congress in the Dodd-Frank Act when they mandated that the swaps area go to open clearing and common clearing. But specifically set in the futures industry, that's not the rule. Exchange-directed clearing. So the open interest sits at the clearinghouse, but it's inextricably linked to the operation of the exchange. The two are absolutely tied. The plaintiff's basic theory in this case is that the Chicago Board of Trade was required to step back and disassociate itself from that open interest. The CFTC clearly ruled to the contrary. And I will run short on time, but I would commit to the court, if you look at Judge Durkin's discussion on page 7, 8, and 9 of his opinion, that's in the appendix at page 20 through 22, he does a fantastic job of synthesizing everything that the CFTC looked at when it considered this question. Critically, they provided for public comment. It was a short period, but again, they had no obligation to do so. These plaintiffs came in and objected to the CFTC's approval of the rule. The plaintiffs came in and said, you can't pass this rule consistent with section 15B of the Commodity Exchange Act. That section requires the CFTC, when it is affirmatively approving a rule, which it did here, there's really no question that they had the authority to approve, to consider and approve the rule. 15B says, you have to take into account any anti-competitive concerns. And these plaintiffs came in and objected and said, you can't pass this rule, CFTC, because of the competitive concerns. And the CFTC heard that comment. The CFTC referenced all of the other discussions that have been going on in its own administration and publicly about the benefits of the exchange-directed clearing model. And they said, we're taking all that into consideration, and we are approving the rule. And we're approving the rule not just as consistent with the Commodity Exchange Act. That's not what they said. They said, we're approving the rule as advancing the policies of the Commodity Exchange Act with respect to financial security and integrity of the contracts and innovation. And frankly, they said, people have talked about some other mechanism, fungibility or forced sharing, which is what the plaintiffs wanted here. They wanted to come in and free ride off of the open interest in CBOC contracts. Well, once they're in the clearinghouse, are they insulated? I'm sorry, Your Honor? Once these, what you just referred to, how you described them, and what everybody's competing for, supposedly, is that once it's in this so-called clearinghouse, they are insulated from someone coming out from the outside and, I guess, kind of get a hold of them. What the clearinghouse, yes, in this respect. What the clearinghouse does is it provides, it's the central counterparty for all of the market participants. And so, yes, it insulates against systemic loss. It insulates against credit party risk. And yes, in the exchange-directed clearing model, if I have an exchange and I have a clearinghouse, that clearinghouse cannot make those products fungible with some other exchange. They wanted to force non-exclusive clearing and the idea that an exchange controls where its open interest resides. That is precisely the question that the CFTC considered here. And so the case for implied immunity basically boils down to, can these plaintiffs come into an antitrust court and raise the same issues that they raised in front of the CFTC, that these plaintiffs strategically chose to not pursue administrative review. And if you look at the American Ag decision and the Credit Suisse decision, it touches all of the points with incredible force. There actually could not be a clearer case for implied immunity here. Last thing I would say is on the implied immunity point, the CFTC clearly has the discretion to regulate here. My colleague's reference was to the distinction between a principles-based system and a rules-based system. That doesn't mean that they didn't regulate this question, answer the particular question here with respect to the transfer of open interest, and that they addressed the concerns and the competitive concerns that these plaintiffs themselves raised and overruled them. And having failed to seek administrative review, an antitrust court is not the place to challenge the CFTC's decision. Implied immunity is clear here. With that, unless the court has any other questions, I believe I'm concluded. Thank you, Counsel. Thank you. We'll give you a full two minutes. Thank you, Your Honor. Just a few points. First, let me just make one quick point on the transfer of open interest rules and the statement of my friend on the other side. Just to be clear, for over 70 years, the Board of Trade had a clearing arrangement with BOTC to do their clearing, and they never had an exclusivity provision, and they never had a forced transfer provision. It wasn't until my clients were coming in to compete with them that suddenly this became a very important thing, and they did it for anti-competitive reasons. And the CFTC went through a very rushed process and warned them not to rely too much on the approval and said, if any policy related to these forced transfer rules is held to be invalid, the rule might be withdrawn. The policies under the rule might be withdrawn. And then in the statement that the CFTC made immediately thereafter, which the defendants like to cite, the commission specifically stated that it was aware of the public and industry interests related to these forced transfer and exclusivity clearing rules regarding market structure and competition and looks forward to hearing more on these issues. This is not an agency that has resolved for all time the antitrust issues in connection with these. This is an agency that is saying, okay, you're in a hurry, we get it, we're going to approve this on a very rushed process, but we're telling you it may be withdrawn if it's later determined to be invalid either by us or otherwise, hence the otherwise, and that we're going to continue the discussion about the antitrust and competition implications. That is fundamentally different than what you had, for example, in the Credit Suisse case with the SEC and the decade-long detailed requirements for what you can and can't say when you're marketing securities that the Supreme Court found was sufficient to imply antitrust immunity. And remember, the fundamental point here, which my friend on the other side likes to ignore, is that it is clear that implied antitrust immunity is supposed to be the exception and it's only supposed to happen when there is a clear repugnancy between the regulatory process and the antitrust laws, and here, you don't have that because the agency said we can withdraw it if there's a problem later and we're going to continue to consider comments about competition. That alone should take this out of implied antitrust immunity, even putting aside the differences. Thank you, Counsel. Thank you, Your Honors. Thanks to both counsel on the cases taken under advisement.